UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

CRYSTAL R. WEST,

Plaintiff,

v. No. ________________

JOHN PHARR,

Defendant.

---

## COMPLAINT

---

PLAINTIFF Crystal R. West, through counsel, submits the following for her complaint against John Pharr:

### Preliminary Statement

1. This action is brought for claims under the Securities Exchange Act of 1934, as well as attendant state law claims.

2. John Pharr fraudulently and in bad faith induced Crystal R. West to join a common investment scheme where she would deposit funds into a pool with other investors for management by Mr. Pharr. The purpose of the pool was to invest in crypto currencies. Ms. West was promised great profit, but she was completely shut out of management and decision-making, relying entirely on Mr. Pharr's expertise and honesty. This loss of control, combined with the pooling of funds and expectation of profit, is why the investment is considered a security under federal and state law. Mr. Pharr has for many months refused to return any of Ms. West's investment.

### Parties

3. Plaintiff Crystal R. West is a citizen and resident of Bradley County, Tennessee.

4. Defendant John Pharr is a citizen and resident of Bradley County, Tennessee, and may be served at 1924 Tunnel Hill Rd SW, Cleveland, TN 37311.

## Jurisdiction & Venue

5. This Court is vested with original jurisdiction under 28 U.S.C. §§ 1331 and 1343 for the claims for alleged violation of Federal law.

6. This Court has jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 as they arise from the same case and the same controversies.

7. This action addresses the taking under false pretenses of in excess of $500,000 from an individual unaccredited investor by a fraudulent investment contract, creating a federal question under the Securities Exchange Act of 1934 and, separately, similar provisions of state law.

8. Venue is proper in this Court, Chattanooga Division, under 28 U.S.C. § 1931(b) as all parties reside in Bradley County, Tennessee, and the acts giving rise to this cause of action occurred in Bradley County, Tennessee.

## Facts

9. John Pharr approached Crystal West about what he called an investment opportunity.

10. Mr. Pharr is a contractor who builds houses.

11. Ms. West knew Mr. Pharr from her work through her boyfriend.

12. Ms. West met Mr. Pharr around the first of May, 2025.

13. In his efforts to induce Ms. West to invest, and on that first meeting, Mr. Pharr visited Ms. West's boyfriend at his residence and in Ms. West's presence, and tried to get each of them to invest, telling them that one of Mr. Pharr's investors had made about $60,000 in a couple of days. Ms. West was part of this conversation.

14. Mr. Pharr also said to Ms. West's boyfriend that several of Mr. Pharr's clients were getting rich with him.

15. Mr Pharr said to Ms. West in May of 2025 that the banks were not doing well and that Ms. West would not want to have your money in the bank because of the low rate of interest.

16. Ms. West told Mr. Pharr that she was interested in investing, and that her boyfriend was not.

17. Mr. Pharr showed his phone to Ms. West, indicating by a calculator on his phone that one of his clients had several hundred thousand dollars invested, and that another had $24,000,000 invested with Pharr.

18. After Ms. West sent the first wire to Mr. Pharr, he told Ms. West that she would be a multimillionaire.

19. At that same meeting, Mr. Pharr told Ms. West that one of his clients was about to buy a $400,000 car and wants to buy another mansion in another town. Mr. Pharr feigned anger, boasting that he [Mr. Pharr] had "ruined him [his client]." Mr. Pharr continued, stating that he had made his client so much money that it had corrupted his client. He told Ms. West that he was angry at that client and told him he was going to give him back all his money, but then his client came back and pleaded for Mr. Pharr to work with him again.

20. Mr. Pharr told Ms. West that she could get her money out at any time.

21. Mr. Pharr said he would grow Ms. West's money so they could possibly develop a subdivision together or other projects, like affordable housing.

22. Mr. Pharr said he had 16 clients, then said he had 4 more new clients, and that some of these made small investments with him, and some made large investments with him.

23. Mr. Pharr also said the investment opportunity would become like a bank over time, with a projected $50,000,000 in pooled assets under management.

24. After being persuaded by Mr. Pharr' efforts, Ms. West made her initial investment with Mr. Pharr at end of May, 2025.

25. Mr. Pharr offered the following compensation structure: 10% of the principal invested would be his to keep. When an interest in crypto currency was sold, he would take 10% of the total proceeds (not just of the gains).

26. When Ms. West asked if any others asked about their accounts, Mr. Pharr said, "no, no one is complaining."

27. Ms. West does not meet the definition of accredited investor under Rule 501 of Regulation D under the Securities Act of 1933 (17 C.F.R. § 230-501), as amended, or under Tenn. Code Ann. § 48-2-102 (referring to the federal rule for its definition).

28. Mr. Pharr led West to believe that they had a special relationship, allowing her into their home and to engage with their children, even stating Ms. West could be like an aunt to Mr. Pharr's children.

29. Mr. Pharr, in their scheme to develop trust, also suggested that there would be additional opportunities, and that they might partner in developing real property.

30. Mr. Pharr invited West to contribute funds to their investment pool.

31. Mr. Pharr repeatedly stated to West that they had several other investors.

32. Mr. Pharr told West that she would profit and benefit from the investment.

33. Mr. Pharr told West that she would not have anything to do with management of the funds, and that they would do all the work.

34. Ms. West agreed to transfer monies that she held to Mr. Pharr's account.

35. Ms. West sent $230,000 by wire transfer to Mr. Pharr on May 23, 2025.

36. Ms. West sent $255,000 by wire to Mr. Pharr on May 27, 2025.

37. Ms. West paid a 10% fee in cash to Mr. Pharr: $23,000 on May 23, then on May 27, $15,500. The May 27 payment was $10,000 short as Ms. West did not have sufficient cash.

38. Mr. Pharr has taken $400 per month for a purported subscription with Coinbase, the first 400 having been taken from her bank account via Zelle, and for subsequent payments Mr. Pharr said he was taking this fee from her principal.

39. Mr. Pharr is not registered with the SEC or any other regulatory body for investment contracts.

40. Mr. Pharr held himself out as an investment broker of skill.

41. Mr. Pharr told Ms. West he was a day trader.

42. Mr. Pharr further represented that he would act as fiduciary for Ms. West.

43. Despite there being no contractual provision that Ms. West could not reclaim her funds, Pharr rebuffed any such request.

44. Ms. West asked for the return of $250,000 on July 31, 2025. Mr. Pharr lost his temper, stating the money would not be available until the first of the year.

45. After being rebuffed, Ms. West then requested a return of $30,000. Mr. Pharr responded by asking her to come by the next day. When Ms. West returned, Mr. Pharr said that her investment was down in value and led her to believe it would be in her best interest to leave the $30,000 with him.

46. Ms. West would have used the $250,000 to buy a manufactured home; she is a renter.

47. On September 17, 2025, Ms. West asked for a ten-minute call with Mr. Pharr, but this was not forthcoming.

48. After being unable to reach Mr. Pharr for many weeks, Ms. West made a police report and sought counsel.

49. Mr. Pharr claims, on information and belief, that the bulk of Ms. West's funds are held in Coinbase, Inc.

50. When Ms. West asked for an accounting on or about the second week of June, 2025, Mr. Pharr said yes, appearing to agree, and directed that the accounting was in the other room on his computer. Mr. Pharr was vague and did not take her to see it, and instead just kept talking. To date, Mr. Pharr has produced no accounting.

51. On or about third week of June 2025, Mr. Pharr told his wife to go get the computer, and she came back stating there was a computer issue, and so she could not produce any records.

52. Ms. West requested the return of $250,000 on July 31, 2025.

53. Once Ms. West began to ask for the return of funds, Mr. Pharr begain limiting contact, ultimately cutting contact with Ms. West.

54. Mr. Pharr had previously told Ms. West that she could get her money out at any time.



Case 1:26-cv-00022-CLC-MJD Document 1 Filed 01/30/26 Page 5 of 10 PageID #: 5

55. Despite prior representations of immediate accessibility, on or about June 27, 2025, Mr. Pharr refused to return the funds, "going ballistic," yelling at Ms. West.

56. Mr. Pharr refused to return her money with no explanation and has refused to provide an accounting of the funds.

57. On September 20, 2025, Stephanie Pharr, at the behest of her husband, Defendant Pharr, sent a text message to Ms. West stating that Ms. West had her own account and that she could access it.

58. Ms. West does have an account set up by Mr. Pharr—who compelled her to get a Samsung Galaxy phone for this purpose—but that account was never funded, the funds having been wired directly to Mr. Pharr. If there is another account, Ms. West is unaware.

59. Mr. Pharr's unauthorized refusal to return West's funds constitutes the wrongful exercise of dominion over property inconsistent with West's rights, resulting in West being harmed in that she no longer has access to $500,000, which is her only asset.

60. Mr. Pharr is not communicating with Ms. West and has not offered an explanation for his refusal to return West's money.

61. The investment contract between Mr. Pharr and Ms. West is an unregistered security.

62. Mr. Pharr offered Ms. West no disclosures of risk.

63. The agreement between Ms. West and Mr. Pharr was verbal only.

64. Mr. Pharr said he kept a ledger. On information and belief, he pooled the funds into a single account.

65. He said he was making a bank, so you could borrow money just like a bank from crypto.

66. On September 17, Ms. West attempted to confront Mr. Pharr. He lost his temper and became upset, stating that he would not be available for the next 3 weeks. He further directed Ms. West to speak with his wife, Stephanie Pharr. He stated he was a Christian man, and that Ms. West was like a sister.

67. Mr. Pharr warned Ms. West not to send a message with defamatory intent.



Case 1:26-cv-00022-CLC-MJD Document 1 Filed 01/30/26 Page 6 of 10 PageID #: 6

68. In subjecting her money to the risks of an enterprise over which she had no managerial control, Ms. West entered into a security transaction with Mr. Pharr.

69. Ms. West has been harmed in that she no longer has access to $500,000, which, as a renter, is the only asset she has.

70. UCC § 8-113, codified at Tenn. Code Ann. § 47–8–113, states that a contract or modification for the sale or purchase of a security is enforceable "whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought."

## Causes of Action

### I. Breach of Securities Exchange Act of 1934

71. Plaintiff repeats and alleges the facts in the foregoing paragraphs as if restated herein.

72. Mr. Pharr offered and sold to West an investment contract.

73. Ms. West invested in excess of half a million dollars with Mr. Pharr.

74. The funds, as related by Mr. Pharr, were held in a pool with funds from other investors with the common goal of investing in cryptocurrencies.

75. Mr. Pharr told Ms. West that she would profit from the venture and receive a positive return on her investment.

76. Mr. Pharr made untrue statements of material fact, including that the investment was liquid (she could "get her money out at any time"), that it was safe as a bank, and that returns were guaranteed.

77. Mr. Pharr knew his statements regarding liquidity and that Ms. West's funds were as safe as if held in a bank were false, and his story about "ruining" his client was also false and designed to mislead Ms. West.

78. Mr. Pharr stated that he would do all the work, make all the decisions, and that Ms. West would simply have to take her profits as they came in.

79. Mr. Pharr both offered and sold the investment to West.

## II. Breach of Tennessee Securities Act

80. Plaintiff repeats and alleges the facts in the foregoing paragraphs as if restated herein.

81. Ms. West furnished initial value to Mr. Pharr in the form of wire transfers of in excess of half a million dollars.

82. The greater portion of this value was subjected to risk in the cryptocurrency market.

83. Mr. Pharr induced this exchange by representations that the investment would grow and accrue to the benefit of West over and above the value of the initial investment.

84. Ms. West was not given any control of the decisions made as to how her money, or any others' money, would be invested or spent, with all control over the funds going to Mr. Pharr.

85. This is a violation of Tenn. Code Ann. § 48-2-121.

## III. Breach of Fiduciary Duty

86. Plaintiff repeats and alleges the facts in the foregoing paragraphs as if restated herein.

87. Mr. Pharr took on a fiduciary duty when he agreed to hold and invest funds on behalf of Ms. West and for her benefit, and to return the same with profits to her at any time.

88. In refusing to return funds held in trust and to otherwise act in Ms. West's best interests, Mr. Pharr breached his fiduciary duty.

## IV. Fraud in the Inducement

89. Plaintiff repeats and alleges the facts in the foregoing paragraphs as if restated herein.

90. Mr. Pharr had stated that he had made one of his clients a millionaire.

91. Mr. Pharr knew that statement was false.

92. This statement, and other statements were made to Ms. West to induce her to convey to Mr. Pharr half a million dollars for management.

93. Ms. West's reliance was reasonable, given the statements he was making about his success, and the documentation Mr. Pharr showed her.

94. Pharr has refused to return Ms. West's money with no explanation.

**V. Unjust Enrichment**

95. This claim arises from Mr. Pharr retaining fees and principal under circumstances where it would be inequitable.

96. Mr. Pharr received monies from Ms. West totaling in excess of half a million dollars.

97. Mr. Pharr immediately conferred a benefit upon himself by taking substantial fees: $23,000 on May 23 and $15,500 on May 27, 2025.

98. Additionally, Mr. Pharr has been taking $400 per month for a purported subscription with Coinbase.

99. Mr. Pharr knowingly accepted and retained these funds, despite the fact that the entire transaction involved the sale of an unregistered security, was procured by fraud in the inducement, and involved a breach of fiduciary duty.

100. The retention of the investment principal and the substantial compensation fees (totaling $38,500 plus monthly fees) is unjust and inequitable, necessitating restitution.

**VI. Tennessee Consumer Protection Act Claim (TCPA)**

101. Plaintiff repeats and alleges the facts in the foregoing paragraphs as if restated herein.

102. This claim targets the deceptive and unfair practices used during the solicitation of the investment funds.

103. In the course of offering investment contracts, which constitutes trade or commerce, Mr. Pharr engaged in numerous unfair or deceptive acts and practices to induce West to invest.

104. Mr. Pharr misrepresented his prior success and skill by stating he had made one individual a millionaire, and claimed to have clients with massive investments, including one with $24,000,000 invested with him.

105. Mr. Pharr also falsely projected that West would become a multimillionaire.

106. Mr. Pharr held himself out as an investment broker of skill despite his not being registered with the SEC or any other regulatory body for investment contracts.

107. Mr. Pharr made a false promise regarding liquidity, assuring Ms. West she could get her money out at any time, a representation he later repudiated when he "went ballistic" and refused to return $250,000 on July 31, 2025.

108. These material misrepresentations were made by Mr. Pharr with the intent to induce West's reliance, which resulted in West being harmed by the loss of access to $500,000.

WHEREFORE Plaintiff requests the following:

1. That summonses issue against defendants.

2. That the Mr. Pharr be ordered to return all funds West has given to them to West, including any fees.

3. That punitive damages be awarded under for Mr. Pharr's malicious, fraudulent, or reckless conduct.

4. That, should Mr. Pharr be found to have violated the Tennessee Consumer Protection Act, Ms. West be awarded treble damages.

5. That Ms. West be Awarded all such other relief as is just and equitable.

Dated December 30, 2025.

Respectfully submitted,

Crystal R. West

Crystal R. West

SR Law, PLLC

By: /s/ *Sheridan C.F. Randolph*
Sheridan C.F. Randolph (034520)
255 N. Ocoee St., P.O. Box 1035
Cleveland, TN 37364-1035
(423) 464-6793 phone
sheridan@sheridanrandolph.com
*Attorney for Crystal R. West*